1  ROBERT M. FUSFELD (fusfeldr@sec.gov) Colorado Bar No. 13097
2  KURT L. GOTTSCHALL (gottschallk@sec.gov) Colorado Bar No. 28377
   RICHARD M. BAYUS, II (bayusr@sec.gov) Georgia Bar No. 043355
3  Attorneys for U.S. Securities and Exchange Commission
   1801 California Street, Suite 1500
4  Denver, Colorado 80202
5  Telephone:  (303) 844-1000
   Facsimile:  (303) 844-1068
6
                              E-Filing
7
8
9                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
                         SAN JOSE DIVISION
10
                                        C  05  3843
11  _____
                                      :  CIVIL ACTION NUMBER
12  SECURITIES AND EXCHANGE           :
    COMMISSION,                       :
13          Plaintiff,                :
                                      :
14  v.                                :   **COMPLAINT**
                                      :
15  KEITH G. BAXTER,                  :
    RONALD J. GOEDDE,                 :
16  RICHARD D. NYE,                   :
    ROBERT E. ELLINGTON,              :
17  ANTHONY W. O'DELL                 :
                                      :
18                                    :
    Defendants.                       :
19  _____ :

20
            Plaintiff Securities and Exchange Commission ("Commission") for its complaint alleges
21
    as follows:
22

23                    **I.  SUMMARY OF THE ACTION**

24          1.      From 1996 through 2000, Cornerstone Propane Partners, L.P. ("Cornerstone"),

25  formerly one of the nation's largest propane marketers, failed to keep appropriate accounting

26  records or take reasonable steps to verify the accuracy of its account balances at its largest


    Complaint

1   subsidiary, Coast Energy Group ("CEG").  During this time period, Cornerstone and CEG

2   management knew about but failed to take sufficient steps to correct CEG's widespread and

3   chronic record-keeping problems and the resulting unreliability of Cornerstone's financial

4   statements.

5       2.      During late 2000 and 2001, Cornerstone hired new management at CEG, who in

6   turn supervised a massive project to verify hundreds of millions of dollars of account balances

7   recorded in its accounting records.  Due to CEG's past record-keeping problems, CEG's project

8   to verify account balances continued for eighteen months, and necessitated the reconstruction of

9   thousands of CEG business transactions and scores of accounts.

10      3.      As CEG's account verification project continued through 2000 and 2001, it

11  uncovered hundreds of millions of dollars of unsubstantiated account balances from many of

12  CEG's business units.  CEG's inability to substantiate accounts also caused obvious errors during

13  Cornerstone's preparation of its financial statements.  Rather than fixing or disclosing these

14  errors, Cornerstone and CEG executives concealed them from the company's outside auditors.

15      4.      While CEG continued its massive project to verify its account balances,

16  Cornerstone published materially false financial statements in its Commission filings for the

17  company's fiscal year ended June 30, 2000, and the first, second and third quarters of its 2001

18  fiscal year.  While CEG's account verification project was continuing, Cornerstone's financial

19  statements were materially false because Cornerstone's account balances did not accurately

20  represent the transactions of the company.  Cornerstone's financial statements were also

21  materially false and unreliable because the company was not able to substantiate hundreds of

22  millions of dollars of account balances and could not determine when or if those balances would

23  be verified.  Cornerstone's financial statements were also materially false because they were not

24  prepared in conformity with generally accepted accounting principles ("GAAP").  SEC rules

25  require that financial statements filed with it must be prepared in conformity with GAAP.

26

Complaint

5.     While CEG's account verification project was continuing, Cornerstone failed to disclose the likelihood that the company would be forced to write-off those account balances that it was unable to verify or substantiate.  Cornerstone also failed to disclose the company's inability to properly consolidate its financial statements.

6.     CEG's account verification project was not successful, which caused Cornerstone to write-off approximately $15 million in unsubstantiated balances from its financial statements as of June 30, 2001.

7.     In a September 28, 2001 press release and its 2001 Form 10-K, Cornerstone disclosed the amount of the write-off, but falsely described both what necessitated CEG's account verification project and the CEG business units that were included in the write-off. Cornerstone's disclosures failed to inform the public that the majority of the write-off related to years prior to 2001.

8.     Even after the write-off, CEG's past accounting problems continued to plague the company, leading to Cornerstone's inability to file audited financial statements with the Commission in 2002 and the Commission's deregistration of its limited partnership units in 2003.  These events in turn contributed to the company's eventual bankruptcy in 2004.

9.     The defendants named in this action are five of Cornerstone's former officers, directors and executives who were responsible for Cornerstone's accounting improprieties and/or the related misleading public disclosures:  chief executive officer **Keith G. Baxter ("Baxter")** , chief financial officer **Ronald J. Goedde ("Goedde")**, vice president of finance and later acting chief financial officer **Richard D. Nye ("Nye")** corporate controller **Robert E. Ellington ("Ellington")** and chief financial officer of CEG **Anthony W. O'Dell ("O'Dell")**.

10.     Baxter, Goedde, Nye and Ellington knew of CEG's widespread accounting problems, the scope and serious nature of the account verification project and that Cornerstone's financial statements accompanying its 2000 Form 10-K and Forms 10-Q for the first, second and third quarters of 2001 filed with the Commission were materially false and not prepared in

Complaint

3

1   conformity with GAAP.  Similarly, O'Dell knew of CEG's widespread accounting problems, the

2   scope and serious nature of the account verification project and that Cornerstone's financial

3   statements accompanying its 2000 Form 10-K and Forms 10-Q for the first quarter of 2001 filed

4   with the Commission were materially false and not prepared in conformity with GAAP.  Each of

5   the Defendants was responsible for reviewing and approving the materially false Commission

6   filings referenced above.

7         11.     In addition to their participation in Cornerstone's improper accounting practices,

8   Baxter, Goedde and Nye knowingly signed false management representation letters to

9   Cornerstone's outside auditors in connection with their audit or review of Cornerstone's financial

10   statements.  Goedde, Nye, Ellington and O'Dell also misled Cornerstone's outside auditors by

11   failing to disclose the nature and extent of CEG's account verification project and were aware of

12   entries in CEG's financial records to conceal erroneous CEG account balances during the

13   auditors' review of Cornerstone's financial statements.

14         12.     Baxter and Nye also caused Cornerstone's materially false and misleading public

15   disclosures regarding the write-off of CEG's unsubstantiated account balances in a press release

16   dated September 28, 2001 and the company's 2001 Form 10-K.

17                          **II.  JURISDICTION AND VENUE**

18         13.     The Commission brings this action pursuant to the authority conferred upon it by

19   Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) & (e)] for an order permanently

20   restraining and enjoining Defendants and granting other equitable relief.

21         14.     This Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of

22   the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

23         15.     Venue lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. §

24   78aa].  Defendants Baxter and Nye reside within the San Jose division of this judicial district.

25   Additionally, certain of the transactions, acts, practices and courses of business constituting the

26   violations of law alleged herein occurred within the San Jose division of this judicial district.

Complaint

4

16.     In connection with the transactions, acts, practices, and courses of business described in this Complaint, Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, of the facilities of a national securities exchange, and/or of the means and instruments of transportation or communication in interstate commerce.

### III.  INTRADISTRICT ASSIGNMENT

17.     Defendants Baxter and Nye reside within the San Jose Division of this judicial district.  Defendants Baxter and Nye reside in Santa Cruz County, California.

### IV.  DEFENDANTS

18.     **Keith G. Baxter** is a resident of Watsonville, California.  From December 1996 until July 2002, Baxter was the chief executive officer of Cornerstone and the Chairman of the board of directors of Cornerstone's general partner.  In his capacity as Cornerstone's chief executive officer, Baxter reviewed and approved Cornerstone's Forms 10-K for the years ended June 30, 2000 and June 30, 2001 and its Forms 10-Q for the first, second and third quarters of 2001.  Baxter also signed Cornerstone's Forms 10-K for the years ended June 30, 2000 and June 30, 2001.

19.     **Ronald J. Goedde** is a resident of Davis, California.  From 1996 until June 30, 2001, Goedde was the chief financial officer of Cornerstone.  In his capacity as Cornerstone's chief financial officer, Goedde prepared, reviewed and signed Cornerstone's Form 10-K for the year ended June 30, 2000 and its Forms 10-Q for the first, second and third quarters of 2001.

20.     **Richard D. Nye** is a resident of Aptos, California.  Nye was vice president of finance and administration of Cornerstone from January 1998 until November 2002, and from July 2001 until June 2002, Nye was acting chief financial officer of Cornerstone.  In his capacity as Cornerstone's vice president of finance and administration, and later as acting chief financial officer, Nye prepared, reviewed and signed Cornerstone's Forms 10-K for the years ended June 30, 2000 and June 30, 2001 and its Forms 10-Q for the first, second and third quarters of 2001.

Complaint

1   Nye has been licensed as a certified public accountant in the state of Texas from approximately

2   1979 through the present.

3       21.   **Robert E. Ellington** is a resident of Carrollton, Georgia.  From November 1998

4   until March 2003 Ellington was Cornerstone's controller.  In his capacity as Cornerstone's

5   controller, Ellington prepared, reviewed and approved Cornerstone's Forms 10-K for the years

6   ended June 30, 2000 and June 30, 2001 and its Forms 10-Q for the first, second and third

7   quarters of 2001.  Ellington has been licensed as a certified public accountant in the state of

8   Missouri from approximately 1984 through the present and in the state of Oklahoma from

9   approximately 1984 through the present.

10       22.   **Anthony W. O'Dell** is a resident of Richmond, Texas.  From 1996 until October

11   2000, O'Dell was the chief financial officer of CEG.  In his capacity as the chief financial officer

12   of CEG, O'Dell prepared, reviewed and approved Cornerstone's Form 10-K for the company's

13   year ended June 30, 2000.  O'Dell has been licensed as a certified public accountant in the state

14   of Texas from approximately 1996 through the present.

15                   **V.  RELATED PARTIES**

16       23.   Cornerstone was a Delaware limited partnership previously headquartered in

17   Watsonville, California.  Cornerstone was formerly one of the nation's largest retail propane

18   marketers, serving customers in thirty states and Canada.  Cornerstone maintained a fiscal year

19   beginning July 1 and ending June 30.  Cornerstone's limited partnership units were registered

20   with the Commission pursuant to Section 12(b) of the Exchange Act, and traded on the New

21   York Stock Exchange ("NYSE") until December 2003, when the Commission de-registered

22   Cornerstone's limited partnership units pursuant to Section 12(j) of the Exchange Act.  On

23   June 3, 2004, Cornerstone filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the

24   Southern District of New York.  The Bankruptcy Court confirmed Cornerstone's Plan of

25   Reorganization on November 8, 2004.  In the course of the bankruptcy, all of Cornerstone's

26   remaining assets were transferred to a new, privately-held entity.

Complaint

24.     Northwestern Corporation is headquartered in Sioux Falls, South Dakota, and operates a regulated utility business in South Dakota, Nebraska and Montana.  Northwestern formed Cornerstone in October 1996 to hold and operate Northwestern's non-regulated propane business.  Following Cornerstone's initial public offering of partnership units, Northwestern retained ownership of thirty percent of Cornerstone's limited partnership interests and control over Cornerstone's general partners and board of directors.

## VI.  SUMMARY OF VIOLATIONS AND RELIEF SOUGHT

25.     Defendants Baxter, Goedde and Nye violated Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13b2-1 and 240.13b2-2] thereunder, and aided and abetted Cornerstone's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13] thereunder, and unless restrained and enjoined will violate or aid and abet violations of such provisions.

26.     Defendants Ellington and O'Dell violated Section 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78m(b)(5)] and Rules 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.13b2-1 and 240.13b2-2] thereunder, and aided and abetted Cornerstone's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78(b)(2)(A), 78(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13] thereunder, and unless restrained and enjoined will violate or aid and abet violations of such provisions.

27.     The Commission also seeks an equitable order requiring Baxter, Goedde and Nye to disgorge all ill-gotten gains they obtained from their fraudulent conduct, including, but not limited to, the proceeds of any sales of Cornerstone limited partnership units, all benefits from

Complaint

7

1 their employment at Cornerstone such as their salary, bonuses, stock and other compensation,

2 including prejudgment and post-judgment interest.

3      28.    The Commission also seeks an order requiring Baxter, Goedde and Nye to pay

4 third tier civil penalties and requiring Ellington to pay a $25,000 civil penalty pursuant to Section

5 21(d)(3) of the Exchange Act [15 U.S.C. §§ 77t(d) and 78u(d)(3)].

6      29.    The Commission also seeks an order barring Baxter, Goedde and Nye from

7 serving as an officer and director of any public company pursuant to the equitable authority of the

8 court, and Section 21(d)(2) of the Exchange Act, as amended [15 U.S.C. § 78u(d)(2)].

9 **VII.  FACTS**

10 **A.**    **Background**

11      30.    Cornerstone's business consisted primarily of two divisions:  a retail division,

12 which sold propane through approximately 250 customer service centers nationwide; and a

13 wholesale division, CEG, which primarily purchased, processed and sold wholesale propane and

14 other energy products.

15      31.    Between 1997 and 2000, Cornerstone's retail division acquired approximately

16 forty-five customer service centers.  During the same period, CEG expanded its wholesale

17 operations by, among other things, acquiring three oil and natural gas companies.  As a result of

18 its various acquisitions, Cornerstone's revenue grew from $389 million in 1997 to $3.7 billion in

19 2000.  CEG's revenue increased from $240 million in 1997 to almost $3.4 billion in 2000.

20      32.    In 1997 through 2000, each of the Defendants knew that Cornerstone had failed to

21 improve its accounting systems, hire additional accounting staff, or enhance its record-keeping

22 processes to keep pace with the company's dramatic growth and diversification.

23

24

25

26

Complaint

**B.   1996 Through 2000 -- Cornerstone's CEG Division Did Not Maintain Complete and Accurate Accounting Records Of Its Transactions Nor Did It Verify The Accuracy Of Its Accounts**

33.     As a public company, Cornerstone was required to maintain accounting records which fairly and accurately reflected its transactions throughout its operations, including those of CEG.

34.     As part of its normal accounting procedures, Cornerstone was required to consolidate the financial results of all of its divisions, including CEG, in order to produce the financial results of the company as a whole.  Each of the defendants reviewed and approved of Cornerstone's consolidated financial statements.  O'Dell reviewed CEG's financial statements and transmitted them to Ellington.  Ellington then consolidated the financial results of CEG with those of the retail division of Cornerstone.  Goedde and Nye reviewed the financial statements of CEG and the retail division, then reviewed them with Baxter.

35.     In the preparation of its financial statements, Cornerstone was required by GAAP and Commission rules to provide reasonable assurances that all of its account balances reported to the public, including CEG's, were verified as materially accurate, reliable and presented in conformity with GAAP.

36.     As described in detail below, from 1996 through 2000, each of the Defendants knew that CEG failed to maintain adequate and accurate documentation regarding many of its transactions.  Each of the Defendants also knew that because proper documentation had not been maintained, CEG was unable to verify various significant account balances.  Because of CEG's chronic record-keeping problems and inability to verify its account balances, each of the Defendants knew that Cornerstone's financial statements were materially false, unreliable and not prepared in conformity with GAAP.

37.     For example, from 1996 through 2000, CEG was unable to verify account balances for accounts typically used by all public companies to track their routine transactions

Complaint

9

1    such as accounts receivable (amounts owed by customers), accounts payable (amounts owed to

2    third parties), cost of sales and cash.

3         38.    From 1996 through 2000, CEG was also unable to verify balances in certain other

4    accounts that were unique to CEG's business of buying and selling various energy products.

5    These accounts, known as clearing accounts, were used to track CEG's purchases and sales of

6    energy products by specific location and date.

7         39.    From 1996 through 2000, before reporting its financial results to the public at

8    each quarter-end, CEG did not consistently verify the balances of each individual clearing

9    account.  Instead, CEG often estimated its clearing account balances to report to the public by

10   combining balances from all of the clearing accounts.  Over time, CEG's failure to verify the

11   balances in each individual clearing account led to material errors in the combined balances of its

12   clearing accounts.

13        40.    O'Dell directed that CEG make adjustments to correct errors in the combined

14   clearing account balances only when such adjustments would have a favorable impact upon

15   CEG's financial results.  For example, from 1996 through 1998, O'Dell directed that CEG make

16   adjustments to errors in the clearing accounts that improved CEG's financial results.  However,

17   in 1999, when the errors in CEG's clearing accounts would have negatively impacted CEG's

18   financial results, O'Dell ordered that such adjustments not be made.

19        41.    Cornerstone used intercompany accounts to track transactions between its retail

20   propane division and CEG.  Because Cornerstone's retail division and CEG reported their

21   consolidated financial results to the public, if recorded properly, transactions between the retail

22   division and CEG should eliminate – meaning they should net to a zero balance.

23        42.    Throughout each quarter-end of 1999 and 2000, Goedde, Nye, Ellington and

24   O'Dell knew that Cornerstone's intercompany accounts did not eliminate in consolidation and

25   therefore knew these balances were inaccurate and signaled a problem.  Goedde, Nye, Ellington

26   and O'Dell also knew that Cornerstone's intercompany accounts did not eliminate in

Complaint
                                        10

consolidation because CEG had failed to maintain appropriate records of its transactions with the retail division or input those transactions properly in Cornerstone's accounting system.

43.     Because CEG had operations in both the United States and Canada, accounting for its routine transactions also required it to track the currency in which its purchases and sales had been made.  Goedde, Nye, Ellington and O'Dell knew that CEG habitually failed to properly account for the differences in value between the United States and Canadian dollar.  CEG's accounting software did not properly calculate or record currency conversions for transactions involving Canadian dollars.  Although Goedde, Nye, Ellington and O'Dell knew manual correction entries were not routinely completed, they did nothing to fix these errors.

44.     Each of the Defendants knew that CEG's record-keeping and account verification practices deteriorated further in 1999 as a result of Cornerstone's use of two different accounting software systems.

45.     In January 1999, each of the Defendants knew that Cornerstone began using new accounting software for the preparation of its consolidated financial statements.  Cornerstone's main accounting software was different from and did not accept information from the accounting software that CEG continued to use.  Because CEG used different accounting software than the rest of Cornerstone, in order to accurately record its transactions, CEG had to maintain detailed accounting records in its own system, then transfer summary information to Cornerstone's accounting system.  However, CEG failed to maintain appropriate accounting records on its own system or to ensure that Cornerstone maintained appropriate records regarding CEG's transactions.  This in turn caused large discrepancies between account balances tracked on both the CEG and Cornerstone accounting systems.

46.     Throughout fiscal year 2000, O'Dell knew CEG had failed to maintain adequate accounting records regarding its transactions in its own accounting system.  O'Dell also knew that without detailed accounting records of its transactions, CEG could not verify the accuracy of its accounts.  Rather than mandating that CEG maintain detailed accounting records of its

Complaint

1   transactions, O'Dell instead directed CEG staff to estimate CEG account balances for the

2   preparation of Cornerstone's financial statements.

3       47.     Baxter, Goedde, Nye and Ellington were repeatedly made aware of CEG's

4   widespread accounting deficiencies.  For example, on August 24, 1998, at the conclusion of

5   Cornerstone's year-end audit for fiscal 1998, Cornerstone's outside auditors sent a letter to

6   Cornerstone specifically raising concerns regarding various CEG record-keeping and account

7   verification deficiencies.  Also, from 1998 through 2000, Baxter, Goedde, Nye and Ellington

8   failed to ensure that the CEG record-keeping and account verification deficiencies brought to

9   their attention by their outside auditors were resolved.

10      48.     During regular senior management and accounting group conference calls and

11  numerous internal communications during 1999 and 2000, Baxter, Goedde, Nye and Ellington

12  were repeatedly advised of CEG's systemic accounting deficiencies, including CEG's failure to

13  keep detailed records of its transactions and its inability to verify the accuracy of its accounts.

14  During 1999 and 2000, Baxter, Goedde, Nye and Ellington failed to ensure that the CEG record-

15  keeping and account verification deficiencies brought to their attention by O'Dell and other CEG

16  accounting staff were resolved.

17  **C.    2000 - CEG Began To Improve Its Accounting Record-Keeping And Started A
        Systematic Verification Of Its Account Balances**

18

19      49.     In March 2000, Cornerstone hired a CEG controller.  Each of the Defendants

20  knew that CEG's new controller was primarily tasked with attempting to improve CEG's long-

21  standing record-keeping and account verification problems.

22      50.     CEG's new controller made two fundamental changes to attempt to correct the

23  accounting deficiencies at CEG.  First, going forward, the CEG controller required that CEG

24  maintain detailed records of all of its transactions on its own accounting software.  CEG's

25  controller then supervised a project to fix CEG's past accounting records by finding and

26  inputting the necessary transaction support into CEG's accounting software system.  This process

Complaint

1 was necessary to correct the discrepancies between the CEG and Cornerstone accounting systems

2 and to substantiate CEG's account balances. This project continued from April 2000 through

3 August 2000.

4   51. Second, CEG's controller supervised an extensive project to verify all of CEG's

5 account balances. When CEG's controller began this project, more than half of CEG's accounts

6 had not been properly verified.

7   52. In the comprehensive CEG account verification process, if any portion of an

8 account balance could not be substantiated, this amount was transferred to a special holding

9 account (hereinafter "Holding Account"), while CEG searched for any additional documentation

10 that would support the balances.

11   53. CEG's account verification process was massive in scope and complexity. Many

12 CEG account balances had not been verified in years and some account balances had never been

13 verified. Many account balances reflected thousands of transactions over the course of many

14 years. In order to verify some account balances, CEG accountants attempted to reconstruct past

15 CEG transactions to determine where errors may have been made that would explain any

16 unsubstantiated balances. Some accounts that CEG attempted to reconcile included transactions

17 from business units that CEG no longer owned. Many of the CEG account balances could not be

18 verified at all because CEG lacked any documentation to explain the accuracy or inaccuracy of

19 the account balances.

20   54. Throughout the remainder of 2000, CEG accountants continued to verify account

21 balances and transfer unsubstantiated amounts to the Holding Account for further research.

22   55. Throughout the remainder of 2000, each of the Defendants knew of and received

23 numerous updates as to the status of CEG's massive account verification project during regular

24 senior management and accounting group conference calls and through their receipt of other

25 internal communications.

26

Complaint

**D.**     **2000 Year-End - Cornerstone Filed Materially False Financial Statements With The SEC**

56.     At the time Cornerstone prepared its year-end 2000 financial statements, CEG had not completed either of its massive projects to correct its own accounting system or to verify its account balances.

57.     Because neither of CEG's projects necessary to correct its accounting problems had been completed, as described in detail below, during the process of reviewing Cornerstone's financial statements at year-end 2000, Goedde, Nye, Ellington and O'Dell knew that a variety of account balances that were on their face inaccurate.

58.     However, rather than fixing CEG's record-keeping deficiencies and verifying all of its account balances, Goedde, Nye, Ellington and O'Dell concealed CEG's inaccurate account balances from its outside auditors and the public by reclassifying those balances, meaning that these balances were moved to different accounts.  These reclassifications were not made for the purpose of fixing the errors, but instead served to conceal the inaccurate balances.  Ellington made these reclassifications, at Nye's direction and with the knowledge and approval of O'Dell and Goedde.

59.     For example, because the project to fix CEG's accounting system had not been completed by 2000 year-end, there were huge discrepancies between the account balances reflected on the different accounting software maintained by Cornerstone and CEG.  These discrepancies included $25 million for accounts payable, $6 million for accounts receivable and $16 million for CEG's clearing accounts.  Goedde, Nye, Ellington and O'Dell each knew of the discrepancies between the accounting software maintained by Cornerstone and CEG and approved of CEG's reclassification of these discrepancies to the Holding Account being used in CEG's account verification project.

60.     At 2000 year-end, Goedde, Nye, Ellington and O'Dell also knew that Cornerstone's combined intercompany accounts continued to show inaccurate net balances of

Complaint

14

approximately $1.5 million. They also knew that the combined intercompany account balances should have had a net balance of zero dollars and that a balance of $1.5 million would concern the company's outside auditors. Goedde, Nye, Ellington and O'Dell knew that this difference resulted from errors in CEG's accounting for transactions between CEG and Cornerstone's retail division. However, Ellington, with the knowledge and approval of O'Dell, Nye and Goedde, concealed the intercompany balance from Cornerstone's outside auditors by reclassifying it to another account.

61.     At year-end 2000, each of the Defendants also knew that, due to CEG's record-keeping and account verification problems, Cornerstone was unable to verify the accuracy of the company's primary cash accounts that included transactions from both the retail and CEG divisions. Each of the Defendants also knew that Cornerstone's inability to verify its primary cash accounts resulted from errors in CEG's accounting for transactions. With the knowledge and approval of O'Dell, Nye and Goedde, Ellington repeatedly reclassified inaccurate balances in Cornerstone's primary cash accounts to other accounts.

62.     Due to the reclassifications of the unsubstantiated balances at 2000 year-end, Nye, Ellington and O'Dell knew that CEG's Holding Account included more than $60 million of both positive and negative individual CEG account balances that could not be verified and that the net balance of the account was $1.6 million.

63.     Each of the Defendants reviewed and approved Cornerstone's Form 10-K and accompanying financial statements for fiscal 2000 year-end, filed with the Commission on September 28, 2000. Baxter, Goedde and Nye also signed the 2000 Form 10-K. At the time of their review of the filing, each of the Defendants knew of CEG's chronic record-keeping deficiencies, its inability to verify account balances, and its massive, ongoing projects to input transaction detail to its accounting software and verify its account balances. Due to their knowledge of CEG's problems, at the time of their review of the filing, each of the Defendants knew that Cornerstone's financial statements were not prepared in conformity with GAAP.

Complaint

64.     First, each of the Defendants knew that Cornerstone's 2000 Form 10-K financial statements specifically failed to conform with GAAP because GAAP requires that financial statements be based upon reliable information.  Each of the Defendants knew that the scope of Cornerstone's unsupported accounts, in terms of the number of accounts involved, the balances of those accounts, and the time period for which Cornerstone was attempting to reconcile its transactions, made Cornerstone's financial statements materially false and unreliable.

65.     Second, GAAP requires that when a company identifies a reasonably possible loss, the issuer disclose the potential loss in its financial statements.  Each of the Defendants were reckless in ignoring that a material adjustment to net income was reasonably possible given the size, scope, and complexity of the account verification project.  However, each of the Defendants knew that Cornerstone failed to include any disclosure of this potential loss in the company's Form 10-K.

66.     Third, GAAP and Commission rules governing consolidation of financial statements require that combined intercompany accounts must net to a zero dollar balance.  Commission rules further require that if a public company's combined intercompany accounts do not net to a zero balance, that the company must disclose the existence of the balance and the method of handling the balance.  When Cornerstone filed its 2000 Form 10-K, Goedde, Nye, Ellington and O'Dell knew that Cornerstone's intercompany accounts showed a balance of approximately $1.5 million.  Instead of making required disclosure, as noted above, Ellington reclassified this intercompany balance to hide it, with the approval of Goedde, Nye, and O'Dell.

E.     **2000 Year-End - Cornerstone Concealed The Nature And Extent Of CEG's Unsubstantiated Accounts From Outside Auditors**

67.     During the audit of Cornerstone's 2000 financial statements by its outside auditors, CEG provided the outside auditors with a schedule reflecting entries to the Holding Account through June 30, 2000.  During the course of the outside auditors' review of the Holding Account schedule, O'Dell falsely represented, or caused others to falsely represent to

Complaint

16

1  Cornerstone's outside auditors that the discrepancies were "balance sheet geography" – in other

2  words, unimportant technological or manual errors that caused incorrect balances in various

3  accounts that had no impact on the company's earnings.

4       68.    O'Dell also falsely represented, or caused others to falsely represent to

5  Cornerstone's outside auditors that CEG would be able to verify all of its account balances and

6  that once that process was complete, the positive and negative unsubstantiated balances from

7  various accounts would be approximately equal in total and therefore would not cause any

8  material impact on Cornerstone's financial statements.  O'Dell's representations were false

9  because as of year-end 2000, he knew that not all of CEG's accounts balances could be verified.

10  O'Dell's representations were also false because as of year-end 2000, he knew that given the size

11  and scope to date of the account verification process it would likely have a material effect on

12  Cornerstone's financial statements.

13       69.    During the course of the 2000 audit, each of the Defendants failed to disclose to

14  Cornerstone's outside auditors the scope and magnitude of CEG's account verification project.

15  Goedde and Nye also knew that the scope, magnitude and results to date of CEG's account

16  verification project were inconsistent with the management representation letter they had each

17  signed for Cornerstone's outside auditors.

18       70.    Goedde and Nye also signed the management representation letters to the auditors

19  for year-end 2000.  The management representation letters falsely stated that, among other

20  things: (1) Cornerstone's financial statements were fairly presented in conformity with GAAP;

21  (2) there were no material transactions that had not been properly recorded in the accounting

22  records underlying the financial statements; (3) there were no other loss contingencies required to

23  be disclosed; and (4) the accounting records underlying the financial statements accurately and

24  fairly reflected, in reasonable detail, the transactions of the company and its subsidiaries.  At the

25  time Goedde and Nye signed these management representation letters to Cornerstone's outside

26  auditors, Goedde and Nye each knew that these statements were false.

Complaint

**F.**     **2001 -- Cornerstone Filed Materially False Financial Statements With The SEC And Continued to Conceal The Nature And Extent Of CEG's Unsubstantiated Accounts From Outside Auditors**

71.     During fiscal year 2001, Cornerstone replaced CEG's management.  In August 2000, Cornerstone hired a new president of CEG.  In October 2000, Cornerstone fired O'Dell and hired another CFO of CEG.

72.     During fiscal year 2001, Baxter, Goedde, Nye and Ellington knew that CEG's new management team gradually intensified the account verification project that had begun in 2000, spending more than a year trying to verify hundreds of millions of dollars of unsubstantiated CEG account balances.

73.     Throughout 2001, CEG continued its process of attempting to verify all of its account balances, and transferring any portion of account balances it could not substantiate to the Holding Account.  As CEG's account verification process continued throughout 2001, its accountants transferred unsubstantiated balances totaling hundreds of millions of dollars, from many  additional accounts throughout CEG's operations to the Holding Account.

74.     For example, when consolidating Cornerstone's financial statements at each quarter-end during 2001, Ellington, Nye and Goedde became aware of account balances that were inaccurate on their face stemming from the same CEG accounting problems that they had encountered during 2000.  As in 2000, with Goedde's and Nye's knowledge and approval, Ellington reclassified these inaccurate balances.

75.     In emails and other internal communications throughout 2001, Ellington advised Nye and Goedde that he had reclassified inaccurate CEG balances in order to conceal those balances from Cornerstone's outside auditors during their audit or review of Cornerstone's financial statements.

76.     Baxter, Goedde, Nye and Ellington each received updates throughout 2001 as to the incomplete status of CEG's account verification project effort and resulting unsubstantiated balances.  Nye and Ellington participated in more detailed quarterly reviews regarding specific

Complaint

1   unsubstantiated account balances and the status of balances that had been transferred to the

2   Holding Account.

3      77.    Ellington, Nye, Goedde and Baxter each reviewed and approved Cornerstone's

4   Forms 10-Q and accompanying financial statements for first, second and third quarters of 2001,

5   filed November 14, 2000, February 13, 2001 and May 14, 2001, respectively. Goedde and Nye

6   also signed each of these materially false Form 10-Q Commission filings.

7      78.    Baxter, Goedde, Nye and Ellington each knew that while CEG's account

8   verification process was pending during 2001, Cornerstone's consolidated financial statements

9   accompanying its Forms 10-Q for the first, second and third quarters of 2001 continued to

10  contain materially false and unreliable account balances. At the time of their review of each

11  materially false Commission filing, Baxter, Goedde, Nye and Ellington each knew of CEG's

12  chronic record-keeping deficiencies, its inability to verify account balances, and its massive,

13  ongoing projects to input transaction detail to its accounting software and verify its account

14  balances. Due to their knowledge of CEG's problems, at the time of their review of each filing,

15  Baxter, Goedde, Nye and Ellington each knew that Cornerstone's financial statements were not

16  prepared in conformity with GAAP.

17     79.    First, Baxter, Goedde, Nye, and Ellington, knew that Cornerstone's 2001 Forms

18  10-Q for the first, second, and third quarters of 2001 specifically failed to conform with GAAP

19  because GAAP requires that financial statements be based upon reliable information. Baxter,

20  Goedde, Nye, and Ellington also knew that the scope of Cornerstone's unsupported accounts, in

21  terms of the number of accounts involved, the balances of those accounts, and the time period for

22  which Cornerstone was attempting to reconcile its transactions, made Cornerstone's financial

23  statements materially false and unreliable.

24     80.    Second, GAAP requires that when a company identifies a reasonably possible

25  loss, the company disclose the potential loss in its financial statements. Baxter, Goedde, Nye,

26  and Ellington, were reckless in ignoring that a material adjustment to net income was reasonably

Complaint
                    19

1  possible given the size, scope, and complexity of the account verification project.  However, each

2  of the Defendants knew that Cornerstone failed to include any disclosure of this potential loss in

3  its Forms 10-Q for the first, second and third quarters of 2001.

4          81.     Third, GAAP and Commission rules governing consolidation of financial

5  statements require that combined intercompany accounts must net to a zero dollar balance.

6  Commission rules further require that if a public company's combined intercompany accounts do

7  not net to a zero dollar balance, that the company must disclose the existence of the balance and

8  the method of handling the balance.  When Cornerstone filed its 2001 Forms 10-Q for the first,

9  second, and third quarters, Goedde, Nye, and Ellington knew that Cornerstone's intercompany

10  accounts showed a balance of at least $1.5 million each quarter.  Instead of making required

11  disclosure Ellington reclassified this intercompany balance each quarter to hide it, with the

12  approval of Goedde and Nye.

13          82.     Goedde and Nye also signed management representation letters to the auditors for

14  the first three quarters of 2001.  The management representation letters falsely declared that,

15  among other things: (1) Cornerstone's financial statements were fairly presented in conformity

16  with GAAP; (2) there were no material transactions that had not been properly recorded in the

17  accounting records underlying the financial statements; (3) there were no other loss contingencies

18  required to be disclosed; and (4) the accounting records underlying the financial statements

19  accurately and fairly reflected, in reasonable detail, the transactions of the company and its

20  subsidiaries.  At the time Goedde and Nye signed the above-referenced management

21  representation letters to Cornerstone's outside auditors, Goedde and Nye each knew that these

22  statements were false.

23

24

25

26

Complaint

20

**G.     2001 Year-End – Baxter and Nye Directed Cornerstone's False and Misleading Public Disclosures of its Write-Off of Unsubstantiated Balances**

83.     Even at 2001 year-end, CEG's account verification project had not been successfully completed.  By that time, the Holding Account included more than $320 million of unsubstantiated individual account balances from many of CEG's business units.

84.     At 2001 year-end, CEG provided detailed reports to Baxter and Nye summarizing the results of the massive account verification project that had been ongoing from April 2000 through June 2001.  Among other things, CEG personnel told Baxter and Nye that despite reviewing accounting records and transactions dating back several years, from many of CEG's business units, the account verification project results indicated that CEG should write-off more than $15 million of unsubstantiated account balances.

85.     In July 2001, Nye told the outside auditors about CEG's unsuccessful account verification project and disclosed the significantly larger unsubstantiated balances.  In response, Cornerstone's outside auditors warned Nye that they would not provide an unqualified audit opinion regarding Cornerstone's 2001 year-end financial statements until the unsubstantiated balances were either substantiated or written off.

86.     Baxter and Nye both knew that Commission filing rules required that Cornerstone obtain an unqualified audit opinion in order to file its financial statements and continue trading as a public company.

87.     Rather than continuing CEG's account verification project that Baxter and Nye knew had been unsuccessful throughout 2001, Cornerstone, with assistance from the outside auditors, began a much more limited project to verify the purchase and sale transactions made only by CEG's Canadian crude oil and natural gas businesses.

88.     During late August and early September 2001, Cornerstone and its outside auditors reviewed purchase and sale transactions over the prior eighteen months for CEG's Canadian crude oil and natural gas business units.  However, Cornerstone and its outside auditors

Complaint

1  were unable to find a single purchase or sale transaction accounting error for those business

2  units.

3      89.    In September 2001, Baxter and Nye each actively participated in Cornerstone's

4  decision to write-off CEG's unsubstantiated net account balances as of June 30, 2001.

5      90.    During September 2001, Baxter and Nye actively participated in drafting,

6  reviewing and approving the press release and the disclosures in Cornerstone's Form 10-K

7  regarding CEG's write-off of unsubstantiated balances.

8      91.    On September 28, 2001, Cornerstone issued a press release that, in relevant part,

9  described CEG's write-off of unsubstantiated accounts as follows:

10      Cornerstone Propane Partners, L.P. today reported that it is recording a $9.8

11      million non-cash charge to its fiscal 2001 fourth quarter results following a

12      detailed review of the Canadian crude oil and U.S.-based petroleum liquids

13      processing operations of Coast Energy Group ("CEG"), Cornerstone's

14      commercial energy wholesale and integrated logistics division.  The review was

15      performed in connection with the documentation of the final accounting treatment

16      of the sale of CEG's Canadian crude oil business in fiscal 2001.

17

18      92.    Cornerstone's press release disclosing CEG's write-off was false and misleading

19  because it mischaracterized the write-off as a routine adjustment prompted by the sale of CEG's

20  Canadian crude oil business in 2001.  In fact, CEG's write-off was not prompted by CEG's sale

21  of its Canadian crude oil business, but instead followed CEG's massive account verification

22  project.  CEG's undisclosed account verification project had been underway from April 2000

23  through June 2001, and resulted from years of record-keeping errors and scores of

24  unsubstantiated account balances throughout many of CEG's business units.

25

26

Complaint

93.     At the time of the September 28, 2001 press release, Baxter and Nye each knew that Cornerstone's disclosure of the CEG write-off was materially false and misleading as to, among other things:  what precipitated CEG's account verification project and the CEG business units that were included in the write-off.  Baxter and Nye each also knew that Cornerstone's disclosure of the CEG write-off was materially false and misleading because it failed to disclose the company's inability to determine the prior financial reporting periods to which the write-off should be attributed.

94.     At the time of the September 28, 2001 press release, Baxter and Nye each knew that CEG's review of accounts that led to the write-off had not been performed in connection with the documentation of the final accounting treatment of the sale of the CEG's Canadian crude oil business in fiscal 2001.  In fact, Baxter and Nye knew that CEG's account verification project had begun by April 2000, long before CEG sold its Canadian crude oil business.  Baxter and Nye also knew that CEG's new management team, appointed early in fiscal year 2001, had accelerated and expanded the account verification project prior to the sale of CEG's Canadian crude oil operations.  Baxter and Nye also knew that CEG's account verification project was precipitated by management's belated focus on internal controls, not by the sale of the Canadian crude oil operations.  Baxter and Nye further knew this misstatement was materially false because the public was not informed of the scope and serious nature of CEG's unsuccessful account verification project performed during the preceding eighteen months.

95.     At the time of the September 28, 2001 press release, Baxter and Nye each knew that CEG's write-off related to unsubstantiated balances from many of CEG's business units, not just its "Canadian crude oil and U.S.-based petroleum liquids processing operations" as stated in the press release.  Baxter and Nye further knew that by referencing only certain CEG business units, the disclosure was materially false because it implied that write-offs related to previously divested businesses and that other CEG businesses had not contributed unsubstantiated balances to the write-off.  Baxter and Nye further knew this misstatement was materially false and

Complaint

23

1    misleading because the public was misinformed as to the scope and serious nature of CEG's past

2    account verification problems and the likelihood that Cornerstone might experience similar

3    financial reporting problems regarding business units that CEG had not divested and continued to

4    operate in the future.

5          96.    At the time of the September 28, 2001 press release, Baxter and Nye each knew

6    that internal company estimates had consistently shown that the vast majority of the CEG write-

7    offs related to 1999 and 2000.  However, at Baxter's direction and with Nye's approval,

8    Cornerstone in the press release deleted disclosures that CEG's write-off related to accounting

9    problems or errors in any years before 2001.  Baxter and Nye also knew that the write-off

10   disclosure failed to disclose that Cornerstone's record-keeping was so poor that the company was

11   unable to determine the prior periods to which the write-off should be attributed.  Baxter and Nye

12   further knew this misstatement was materially false because the public was not informed as to the

13   scope, serious nature and time period of CEG's past account verification problems and the

14   likelihood that Cornerstone might experience similar financial reporting problems in the future.

15         97.    Baxter and Nye reviewed, approved and signed Cornerstone's Form 10-K and

16   accompanying financial statements for 2001 year-end, filed with the Commission on October 15,

17   2001.

18         98.    The disclosure of the write-off in Cornerstone's 2001 Form 10-K repeated the

19   materially false and misleading disclosures contained in the September 28, 2001 press release.

20   The 2001 Form 10-K stated, in relevant part, the following:

21         In the fourth quarter of fiscal 2001, the Partnership recorded a $9.8 million non-

22         cash charge following a detailed review of the Canadian crude oil and U.S.-based

23         petroleum liquids processing operations of CEG.  The review was performed in

24         connection with the documentation of the final accounting treatment of the sale of

25         CEG's Canadian crude oil business in fiscal 2001.  It was determined that $8.2

26   

Complaint

24

million of this charge was directly related to the Canadian crude oil business, which is included in "Loss on disposition of business and other non-recurring charges" on the Partnership's Consolidated Statement of Operations.

99.     At the time they reviewed, approved and signed Cornerstone's 2001 Form 10-K, Baxter and Nye each knew that it was false and misleading to assert that $8.2 million of the $9.8 million write-off related to CEG's Canadian crude oil business.  Baxter and Nye knew this statement was materially false and misleading because the $9.8 million written-off by Cornerstone was a net amount and that prior to the application of certain reserves, CEG's unsubstantiated balances being written off totaled more than $15 million.  Therefore, even assuming Cornerstone could substantiate that $8.2 million was related to the Canadian crude oil business, the comparison of the $8.2 million gross figure with the $9.8 million net figure was materially false and misleading.

100.     Baxter and Nye also knew that it was materially false and misleading for Cornerstone to affirmatively represent that $8.2 million of the write-off was attributable to the Canadian crude oil operations because Cornerstone was unable to substantiate any of the $15 million of CEG account balances.

101.     Baxter and Nye further knew that the additional Form 10-K disclosures mischaracterizing the CEG write-off were materially false and misleading because the public was misinformed as to which of CEG's business units contributed unsubstantiated account balances to the write-off.  Baxter and Nye further knew that the additional Form 10-K disclosures were materially false and misleading because they misstated the scope, serious nature and time period of CEG's past account verification problems and the likelihood that Cornerstone might experience similar financial reporting problems in the future.

102.     Baxter and Nye also signed a management representation letter to Cornerstone's outside auditors for the 2001 year-end audit.  The management representation letter falsely stated

Complaint

1    that, among other things: (1) Cornerstone's financial statements were fairly presented in

2    conformity with GAAP; (2) there were no material transactions that had not been properly

3    recorded in the accounting records underlying the financial statements; and (3) the accounting

4    records underlying the financial statements accurately and fairly reflected, in reasonable detail,

5    the transactions of the company and its subsidiaries. At the time Baxter and Nye signed this

6    management representation letter to Cornerstone's outside auditors, Baxter and Nye each knew

7    that these statements were false.

8    **H.**    **Cornerstone's Collapse**

9       103.    Cornerstone's chronic poor accounting practices eventually crippled the company.

10    Cornerstone filed timely Forms 10-Q for the first three quarters of its fiscal year 2002. In early

11    2002, Cornerstone engaged a different accounting firm as the company's outside auditor.

12    However, Cornerstone repeatedly delayed its filing of its Form 10-K for fiscal year 2002 because

13    its new outside auditor would not issue a report containing an unqualified audit opinion.

14       104.    In February 2003, Cornerstone announced its intention to restate its financial

15    statements for 2000 and 2001 to correct the company's accounting for unrelated issues. At the

16    same time, Cornerstone also disclosed that its outside auditor was not willing to perform the

17    re-audit of Cornerstone's 2000 and 2001 financial statements necessary to complete the

18    restatement because of deficiencies in Cornerstone's accounting records during those time

19    periods. Among the primary deficiencies cited by the outside auditors were the extensive

20    accounting deficiencies at CEG that caused the $9.8 million write-off. Cornerstone was

21    subsequently unable to locate any outside auditor that would audit its fiscal 2002 financial

22    statements.

23       105.    Without audited financial statements, the price of Cornerstone partnership units

24    plunged until they were delisted from the NYSE in October 2002. The Commission deregistered

25

26

Complaint

1  Cornerstone's partnership units in December 2003, and the company declared bankruptcy in June

2  2004.

### FIRST CLAIM FOR RELIEF

**(Fraud -- Violations by Baxter, Goedde and Nye of Section 10(b) of the
Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5])**

106.  Paragraphs 1 through 105 are hereby realleged and incorporated by reference.

107.  Defendants Baxter, Goedde and Nye, directly and indirectly, with scienter, in connection with the purchase or sale of Cornerstone securities, by use of the means or instrumentalities of interstate commerce or by use of the mails, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in acts, practices, or courses of business which have been and are operating as a fraud or deceit upon the purchasers or sellers of such securities.

108.  By reason of the foregoing, Defendants Baxter, Goedde and Nye violated, and unless restrained and enjoined, will violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

### SECOND CLAIM FOR RELIEF

**(Falsified Books and Records -- Violations By Baxter, Goedde, Nye, Ellington
and O'Dell of Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]
and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1])**

109.  Paragraphs 1 through 105 are hereby realleged and incorporated by reference.

110.  Defendants Baxter, Goedde, Nye, Ellington and O'Dell knowingly circumvented or knowingly failed to implement a system of internal accounting controls, knowingly falsified books, records, or accounts and directly or indirectly falsified or caused to be falsified books, records or accounts described in Section 13(b)(2) of the Exchange Act.

Complaint

27

111.   By reason of the foregoing, Baxter, Goedde, Nye, Ellington and O'Dell violated, and unless restrained and enjoined, will violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

### THIRD CLAIM FOR RELIEF

**(False SEC Filings -- Aiding and Abetting by Baxter, Goedde, Nye, Ellington and O'Dell of Cornerstone's Violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13])**

112.   Paragraphs 1 through 105 are hereby realleged and incorporated by reference.

113.   Cornerstone, an issuer of a security registered pursuant to Section 12(b) of the Exchange Act, filed materially misleading annual and quarterly reports with the Commission.

114.   By reason of the foregoing, Cornerstone violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

115.   Baxter, Goedde, Nye, Ellington and O'Dell knew of Cornerstone's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder and substantially assisted Cornerstone in committing these violations.

116.   By reason of the foregoing, Baxter, Goedde, Nye, Ellington and O'Dell aided and abetted Cornerstone's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

### FOURTH CLAIM FOR RELIEF

**(False Books and Records -- Aiding and Abetting by Baxter, Goedde, Nye, Ellington and O'Dell of Cornerstone's Violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)])**

117.   Paragraphs 1 through 105 are hereby realleged and incorporated by reference.

Complaint

118.   Cornerstone failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the company's transactions and dispositions of its assets.

119.   By reason of the foregoing, Cornerstone violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

120.   Baxter, Goedde, Nye, Ellington and O'Dell knew of Cornerstone's violations of Section 13(b)(2)(A) of the Exchange Act and substantially assisted Cornerstone in committing these violations.

121.   By reason of the foregoing, Baxter, Goedde, Nye, Ellington and O'Dell aided and abetted Cornerstone's violations of Section 13(b)(2)(A) of the Exchange Act, and unless restrained and enjoined will continue to aid and abet violations of these provisions.

## FIFTH CLAIM FOR RELIEF

**(Internal Accounting Controls Violations -- Aiding and Abetting by Baxter, Goedde, Nye, Ellington and O'Dell of Cornerstone's Violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)])**

122.   Paragraphs 1 through 105 are hereby realleged and incorporated by reference.

123.   Cornerstone failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements and to maintain accountability for assets, and that the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

124.   By reason of the foregoing, Cornerstone violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

Complaint

1    125.   Baxter, Goedde, Nye, Ellington and O'Dell knew of Cornerstone's violations of

2   Section 13(b)(2)(B) of the Exchange Act and substantially assisted Cornerstone in committing

3   these violations.

4    126.   By reason of the foregoing, Baxter, Goedde, Nye, Ellington and O'Dell aided and

5   abetted Cornerstone's violations of Section 13(b)(2)(B) of the Exchange Act, and unless

6   restrained and enjoined will continue to aid and abet violations of these provisions.

7                          **SIXTH CLAIM FOR RELIEF**

8      **(Deceit of Auditors -- Violations by Baxter, Goedde, Nye, Ellington and O'Dell of**
9              **Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2])**

10    127.   Paragraphs 1 through 105 are hereby realleged and incorporated by reference.

11    128.   Baxter, Goedde, Nye, Ellington and O'Dell made materially false or misleading

12   statements, or omitted to state material facts necessary in order to make the statements made, in

13   light of the circumstances under which they were made, not misleading, to Cornerstone's

14   independent auditors in connection with an audit or examination of Cornerstone's financial

15   statements or in the preparation or filing of Cornerstone's documents or reports filed with the

16   Commission.

17    129.   By reason of the foregoing, Baxter, Goedde, Nye, Ellington and O'Dell violated,

18   and unless restrained and enjoined will violate Exchange Act Rule 13b2-2.

19                          **PRAYER FOR RELIEF**

20     WHEREFORE, the Commission respectfully requests that the Court:

21                                **I.**

22   Find that the Defendants, and each of them, committed the violations alleged.

23

24

25

26

Complaint

## II.

Enter an Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each defendant from violating, directly or indirectly, the provisions of law and rules alleged in this complaint.

## III.

Order Defendants Baxter, Goedde and Nye to disgorge all ill-gotten gains received or benefits in any form derived from the illegal conduct alleged in this Complaint, together with pre-judgment and post-judgment interest as provided by law.

## IV.

Order requiring Baxter, Goedde and Nye to pay third tier civil penalties and requiring Ellington to pay a $25,000 civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §§ 77t(d) and 78u(d)(3)].

## V.

Order pursuant to Exchange Act Section 21(d)(2), as amended by Section 305 of the Sarbanes-Oxley Act. [15 U.S.C. 78u(d)(2)], or pursuant to the equitable authority of the court, that Defendants Baxter, Goedde and Nye be permanently barred from serving as an officer or director of any public company.

Complaint

## VI.

1

2      Grant such other relief as this Court may deem just or appropriate.

3

Dated:  September 23, 2005

4

5      Respectfully submitted,

6

7

8      ROBERT M. FUSFELD
       KURT L. GOTTSCHALL
9      RICHARD M. BAYUS, II
       Attorneys for Plaintiff
10     U.S. Securities and Exchange Commission
       1801 California Street, Suite 1500
11     Denver, CO  80202
       Phone: (303) 844-1000
12     Fax: (303) 844-1068

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Complaint